SHERLOCK, Respondent, vs. BRADLEY POLYTECHNIC INSTITUTE, imp., Appellant.
HAAKE, Respondent, vs. SAME, imp., Appellant.

*April 10—October 14, 1924.*

*Vendor and purchaser: Option to purchase land: Liability of owner for misrepresentations of grantee in option: Fraudulent scheme.*

1. In actions by the purchasers of separate tracts of land to set aside and cancel their contracts on the grounds of fraud, the evidence is *held* to sustain a finding that an option to purchase land given by the defendant landowner to another defendant was part of a fraudulent scheme of both to sell the land, as against the landowner's contention that it was not bound by misrepresentations made by the other defendant. p. 437.
2. Parol evidence is admissible to show that a writing which is innocent and valid on its face is part of a fraudulent scheme. p. 438.
3. While an option to sell land is not a contract of hire, and from it alone there can be no liability on the part of the landowner because of misrepresentations made by the buyer to third persons, liability on the part of the owner for such misrepresentations may follow if the contract or option is only one link in a fraudulent scheme. p. 438.

APPEALS from judgments of the circuit court for Portage county: CHESTER A. FOWLER, Judge. *Affirmed.*

The two above entitled actions were brought to set aside and cancel, on the ground of fraud, the purchase by the plaintiffs separately of separate tracts of land from the defendants, each complaint praying for appropriate relief. The *Bradley Polytechnic Institute* was the only defendant that appeared in either case and judgments went against it. By consent of the parties the two actions were tried before the court without a jury, and it was stipulated that the evidence taken should, where possible, apply to both actions.

On October 13, 1919, the defendant *Bradley Polytechnic Institute* entered into a contract with the defendant Erbes as follows:

"Memorandum of agreement for the sale of real estate made this 13th day of October, A. D. 1919, by and between *Bradley Polytechnic Institute,* a corporation, hereinafter denominated 'Owner,' and L. C. Erbes, hereinafter denominated 'Buyer:'

"Witnesseth, that said owner hereby agrees for and during a period terminating January 1, 1924, to sell and convey to the said buyer each of the several tracts of land, including any buildings now situated upon the same set forth and referred to in Schedule 'A' attached hereto, and numbered and marked on the blue-print map attached to said Schedule 'A' at and for the respective amounts set forth in as the total value of said tracts respectively in the last column of said Schedule 'A.'

"Said owner further agrees to accept in payment of the purchase price of each tract of land as so set forth in Schedule 'A' not less than twenty (20 %) per cent. of said total value thereof in cash, the balance of such purchase price in each instance to be paid in ten equal annual instalments, with interest thereon at the rate of six (6 %) per cent. per annum payable annually; said deferred payments in every instance to be evidenced and secured by purchase-money note or notes, and by first mortgage in form and with provisions satisfactory to the owner upon the land sold; or

upon terms satisfactory to the owner and not less favorable to it.

"The owner upon request of the buyer, and payment to it of said cash payment, and execution and delivery to it of note or notes secured·by mortgage for said deferred payments, will from time to time make conveyance of any or either of said tracts of land as the buyer shall direct, and will furnish abstract of title to the same showing good merchantable title to said land in it at the date of said conveyance.

"The buyer shall take and pay for all of said lands in accordance with the terms aforesaid, at the prices named in Schedule 'A' during the period of one year from January 1, 1920, and should any of the lands remain unpaid for on January 1, 1921, the prices fixed for said land in said Schedule 'A' hereto attached shall be increased six (6 %) per cent. of the respective amounts shown in said schedule, and any lands taken by said buyer under this contract, after January 1, 1921, shall be paid for at such advanced prices upon the same terms hereinbefore stated. And any lands not taken and paid for by said buyer before January 1, 1922, shall be increased in price twelve (12 %) per cent. over the respective amounts set forth in said Schedule 'A,' and any of said lands taken by said buyer from and after January 1, 1922, shall be paid for at such increased prices of twelve (12 %) per cent. upon the same terms as are hereinbefore provided for. And any lands not taken and paid for by said buyer before January 1, 1923, shall be increased eighteen (18 %) per cent. of the respective amounts shown in said Schedule 'A.' And any lands taken by said buyer after January 1, 1923, shall be paid for at such advanced · prices of eighteen (18 %) per cent. upon the same terms as hereinbefore provided.

"It is expressly understood and agreed that the time of the completion of the sale and the payment for said lands is of the essence of this contract; and that in case of the failure of said buyer to take and pay for. twenty-five (25 %) per cent. of the total value of all said lands as set forth in said Schedule 'A' before January 1, 1921, or in case of the failure of said buyer to take and pay for fifty (50 %) per cent. of the total value of all of said lands as set forth in

said Schedule 'A' before January 1, 1922; or, in case of the failure of said buyer to take and pay for seventy-five (75 %) per cent. of. the total value of all said lands as is set forth in said Schedule 'A' prior to January 1, 1923; or in case of the failure of said buyer to take and pay for all of the said lands as set forth in said Schedule 'A' prior to January 1, 1924; then and in any and every such case this contract shall, at the option of the owner, be forfeited and determined, and cease to be in force and effect as to any and all such lands as have not been sold and paid for at the date of the declaration of such forfeiture, provided the said buyer shall be given sixty (60) days' notice of the election of the said owner to declare such forfeiture.

"It is further understood and agreed that no title to or interest in the said lands, or any of them, is hereby conferred upon or vested in the said buyer, and that the owner shall and will continue as heretofore in possession of said lands and receive all rents, issues, and profits therefrom until the same are, from time to time, actually taken and paid for pursuant to the terms hereof, and that the owner will make leases for said lands in the usual course of its business, as it sees fit, to tenants who shall farm the same, and that the buyer will accept said lands subject to any leases now existing or thereafter so made; provided, however, that there shall be inserted in all leases made hereafter by the owner, while this agreement remains in force, a provision that such leases may be terminated upon any March 1 succeeding the sale and conveyance of the leased premises by the owner; and provided at least three months' notice, in writing, of his intention to so terminate the same, be given by the landlord to the tenant under said lease, prior to any date fixed for the termination thereof.

"It is further understood and agreed by said buyer that he has entered into this. agreement wholly upon his own investigation and knowledge of the location, surroundings, character, quality, and possibilities of said lands, and that he has not in any way or manner been induced to enter into the same by any statement or representations whatever of the owner or any agent of the owner; and that in any and all transactions hereafter had by him in relation to said lands he will act solely for himself and upon his own re-

sponsibility, and will not, in any way, or manner, whatever, represent or assume to represent the owner, and that he will not at any time hereafter, in any way, disturb or interfere with the farming operations of the owner upon said premises, or any of them, or cause uneasiness among the tenants of the owner, or unnecessarily interfere with their business; but that he will in all things co-operate with the owner in keeping said lands rented to good tenants until the same are taken and paid for by said buyer.

"The headquarters ranch No. 8 on Schedule 'A' is being used by the owner as a headquarters farm from which to handle rented farms, and is considered necessary for that purpose as long as the renting is continued. It is therefore agreed that the owner may continue to use said headquarters ranch as long as there are rented farms to handle not taken and paid for by the buyer. And it is on the other hand agreed that the buyer have the assistance of the manager in handling said lands, provided the buyer shall pay the costs of his accommodations at the headquarters buildings, and that the cost of the time of the manager and his means of transportation for the time used, at the same rate paid by the owner.

"The obligation of this contract shall extend to and be binding upon the heirs, assigns, and personal representatives of the parties hereto."

To this contract and made a part of it was annexed a Schedule 'A' containing a list of Portage county lands owned by the *Bradley Polytechnic Institute.* There were included in the schedule over thirty-five parcels. As to each parcel it gave the number of acres, the value per acre, the value of the land, the value of the buildings, and the total value of each parcel.

On May 7, 1920, the defendant Erbes entered into a contract with the defendant Tillia reading as follows:

"This agreement, made and entered into by and between L. C. Erbes, of St. Paul, Minnesota, party of the first part, and Henry C. Tillia, of Des Moines, Iowa, party of the second part, witnesseth as follows:

"The first party, being the owner of options on certain

lands in Portage county, Wisconsin, as shown by a contract entered into by him with the *Bradley Polytechnic Institute, Inc.,* dated October 13, 1919, a copy of which is hereto attached for reference, does hereby agree to put the said options into the business of the firm of H. J. Tillia & Co. as the same are listed in said contract with the *Bradley Institute,* and to devote his time and ability chiefly to the selling of said lands on joint account upon the terms and conditions hereinafter named.

"The second party, being the owner of the selling business of Henry J. Tillia, handling Wisconsin lands, with office and office force at Des Moines, Iowa, with a going business advertised and working, and with prospects ready to be shown lands, does hereby agree to pay the said business and office force, so far as Wisconsin lands are concerned, into the firm of H. J. Tillia & Co., with their good will and advertised reputation, and to devote his time and ability chiefly to the selling of the said lands in the said contract with the *Bradley Polytechnic Institute* on joint account, upon the following terms and conditions:

"The said parties will put agreed prices on the said lands at which they are to be sold, and will use their best efforts to sell them at such prices, and after paying out of the proceeds of sale the commissions to sub-agents and the cost of showing said lands, and the cost of advertising from and after this date, the surplus over and above the option price shall be considered net profits and be divided equally between the parties thereto.

"The list of prospects, the correspondence, and the services of the office force at Des Moines, pertaining to Wisconsin lands, shall be at the service of both parties without expense.

"If the first party shall sell in the course of business any of the lands in said Wisconsin district, the option of which shall have been secured by the second party heretofore, the net profits on such sales shall be divided by the parties hereto, thirty per cent. to the first party and seventy per cent. to the second party.

"Options secured on lands in said Wisconsin district hereafter by either party during the continuance of this contract shall be joint property and the net profits on same divided as above.

"This contract shall run until March 1, 1921, including the settlements for all sales made prior to that date and any· lands in said contract with the *Bradley Polytechnic Institute* not then sold shall revert to the first party, unless an extension of this contract shall be requested by the party of the second part, which shall be granted for one year.

"If either party shall become incapacitated to devote his time and ability to the business contemplated by this contract prior to said date, March 1, 1921, the other party may at his option terminate this contract, and a settlement of the business done shall be made on the basis above stated; and the remaining lands in said contract with *Bradley Polytechnic Institute* named, or other options taken during the term of this contract, may be sold during the rest of the term of this contract by the one continuing the business and the net profits divided seventy per cent. to him and thirty per cent. to the incapacitated· partner."

Testimony on the issue of fraud was taken, and thereafter in the *Haake* case the court found as facts and conclusions of law as follows:

"(1) On October 13, 1919, the above named defendant entered into a certain contract in writing with the defendant L. C. Erbes in form as set forth in Exhibit 1 hereto attached and hereby made a part hereof with blue-print showing location of tracts numbered on last page thereof.

"(2) The above named defendant was at the time the owner of the referred-to lands and in possession thereof and continued in possession of all said lands after the execution of said contract as before, until negotiations for the sale of two parcels thereof to plaintiff and one *Haake* were completed by the defendant Tillia. The said contract was entered into by the defendant *Institute* for the purpose and with the intent of securing the services of said Erbes, who was a real-estate agent in the business of selling farm lands, in effecting sales of said lands, and with the purpose and intent thereby to avoid responsibility for fraudulent representations made or claimed to be made by said Erbes to purchasers in effecting sales thereof. And it was contemplated by said *Institute* and by said Erbes that the said lands should be sold to farmers as and for farm lands adapted to general farming purposes as farming was generally carried

on in the vicinity of their location, at prices far in excess of their actual value for such purposes, and with knowledge, on the part of said *Institute,* that they were in fact not adapted to general farming purposes and were of less actual value than they were listed at by said contract; and it was contemplated that in lieu of regular commissions for selling said lands, said Erbes should have all that he might be able to procure over and above the amount of payments specified in said contract to be made by said Erbes to said *Institute.* And it was contemplated by said parties that none of said lands should actually be taken by said Erbes except such as he should first succeed in selling to purchasers, and that all payments by Erbes to the *Institute* should be made from the payments made to Erbes by purchasers upon completion of sales.

"(3) After the execution of said contract the defendant Erbes, with the knowledge and approval of the defendant *Institute,* executed to and with the defendant Tillia, who was likewise a real-estate agent with a large and established organization for the sale of farm lands, the certain contract in writing marked Exhibit 2 hereto attached and hereby made a part hereof, for the purpose of securing the services of said Tillia and his said organization in effecting sales of said lands as aforesaid.

"(4) Thereafter the said Tillia interested the plaintiff in the lands described in the complaint, and entered into negotiations with him for the sale thereof to him; and the defendant *Institute* was consulted during said negotiations and informed of the details respecting purchase price and payments. To induce such purchase the said Tillia falsely and fraudulently represented to the plaintiff, in substance, that the soil of said tract was black loam, like soil of Iowa land where plaintiff lived, that it produced 60 to 90 bushels of oats per acre, 25 to 35 bushels of rye, 40 bushels of corn, 200 to 250 bushels of potatoes, and 25 to 30 bushels of buckwheat, each per acre, and that the growing season of the locality was 120 days. The plaintiff believed and relied on said representations and was induced thereby to purchase said lands, and one of his experience and information, in the exercise of ordinary observation and diligence, would not, under all the circumstances, have discovered the falsity of said representations. In fact, the soil of said tract was

not black loam, but black muck or peat of varying thickness with subsoil of sand, and was not like the Iowa soil where plaintiff lived, though on the surface it resembled it in color. The growing season was from 90 to 100 days long, and the lands were continually subject to frosts in summer and early fall which rendered the land unfit for general farming purposes. And the land was not at all adapted to the raising of corn or buckwheat and would not produce the crops thereof as represented or any such crops whatsoever in ordinary seasons, and would not produce more than half, at most, of the represented amount of other crops, and said other crops do not develop on said lands in ordinary seasons and under ordinary conditions.

"(5) On said purchase being completed and on or about February 6, 1921, the plaintiff paid to said Tillia for the parties interested the sum of $1,000 in Liberty bonds, stock to the value of $1,250, cash to the amount of $4,000, and gave his notes for $10,440 running to the defendant Erbes and secured by mortgage on said lands in terms and amount as provided by Exhibit 1, which cash and mortgage notes, to the amount of the price stipulated in said Exhibit 1, was turned over to and accepted by the defendant *Institute*, and the *Institute* executed a deed of said lands to said Erbes, and he in turn conveyed to the plaintiff. The plaintiff also gave his note for $3,160 to said Tillia as part of said purchase price, and a second mortgage on said land to secure the same, making a total consideration of $19,850 paid for said lands.

"(6) The said lands would have been well worth $20,000 had they been as represented, whereas in fact they were worth not to exceed $10,000, and the plaintiff sustained damages in the premises in the sum of $10,000.

"The plaintiff is entitled to judgment for the sum of $10,000 and interest from February 6, 1921, with costs, against the defendant the *Bradley Polytechnic Institute* (said defendant being the only defendant on whom service has been procured and none other having appeared). Let judgment be entered accordingly."

In the *Sherlock* case the court found as follows:

"(1) The facts of this case are in all respects as set out in findings 1, 2, and 3 in said case of *Haake*, which said

findings are hereby referred to and hereby made a part thereof, as findings 1, 2, and 3 hereof.

"(4) The defendant Tillia, after the execution of said Exhibit 2, undertook to negotiate the sales of said land and interested plaintiff in the tract described in the complaint. To induce plaintiff to purchase said tract the said Tillia falsely and fraudulently represented to him, in substance, that the growing season on said lands was 120 days; that the soil was rich black loam, the same as the soil in Iowa where plaintiff lived; that the land would raise any and as good crops as were raised in Iowa; that it produced 40 to 60 bushels of oats to the acre, 25 to 35 of rye, 40 to 50 of corn, 175 to 200 of potatoes, and 25 to 30 bushels of buckwheat, each per acre, annually. And in going over said land and coming to spaces thereon where the top soil had been burned out by fire, said Tillia represented that the land was new breaking and the holes were made by pulling stumps in clearing the land. Whereas the growing season on said land was not to exceed 100 days in length and the land was so subject to frosts in summer and early fall as to be unfit for general farming purposes; the soil was not like or as good as the soil in Iowa where plaintiff lived, but resembled it only in color, and was not rich black loam, but peat or muck with sand subsoil; the soil will not produce as good crops as are raised in Iowa and will not at all in the ordinary seasons raise corn, which is a staple Iowa crop, and all grain crops are extremely uncertain and ordinarily do not fully develop. The land will not produce buckwheat at all, and will not produce of the other crops mentioned over one half the yield represented under the most favorable of circumstances; and said land is not adapted to or fit for general farming purposes.

"(5) The plaintiff believed and relied on said representations and was induced thereby to purchase said lands, and one of his experience and information would not, under the circumstances present, have discovered the falsity thereof by the exercise of ordinary observation and diligence.

"(6) The plaintiff did not move on said lands, but through the agent of the defendant *Institute* rented the same and remained in Iowa, and first learned of the falsity of said representations at threshing time the following season,—

and within a reasonable time after such discovery tendered back conveyance of said lands and demanded of defendants return of the consideration paid therefor, and on defendants' failure to make restitution plaintiff in due season commenced this suit and brought into and left with the court a proper reconveyance of the said lands.

"(7) As consideration for said lands the plaintiff paid and turned over to the defendant Tillia on or about July 1, 1920, for the interested parties, a stock of merchandise of the reasonable and fair value of $4,957.57, which Tillia sold and from the avails paid the defendant *Institute* the cash payment provided for by Exhibit 1; executed notes secured by first mortgage on the land running to defendant Erbes in the sum of $10,200, which Erbes assigned to the *Institute* as the balance of the payment for the tract as per Exhibit 1, and which are now held by said *Institute;* and executed notes aggregating $5,000 and second mortgage securing the same upon said tract running to the defendant Tillia; $1,000 of which notes and interest in said mortgage to secure the same have been assigned to Mrs. Erbes, wife of defendant Erbes, and are now in the possession of the *Institute,* who holds, or claims to hold, the same as trustee for Mrs. Erbes, who is not a party to this suit, and the remainder thereof were assigned by Tillia to other persons not parties to this suit; all which notes bear date of February 26, 1921, and interest at six per cent. from date; and the defendant *Institute,* on receipt of cash and said mortgage as aforesaid, delivered its deed of said tract to said Erbes, and he in turn conveyed to plaintiff.

"(8) The defendant *Institute* was consulted during the negotiations leading to said sale to plaintiff and was informed of the purchase price and terms of payment as aforesaid.

"(1) The sale was void for fraud of the said Tillia, and the defendant *Institute* is equally responsible with said Tillia for the legal consequences of such fraud.

"(2) Judgment should be entered herein declaring the sale void and rescinding the same; declaring void the said $10,200 notes held by the *Institute* and requiring said *Institute* to bring the same into court and surrender the same for cancellation; for recovery by the plaintiff from the de-

fendants Tillia and the *Bradley Polytechnic Institute,* who are the only defendants served or appearing herein, the sum of $4,957.57 and interest thereon at six per cent. from July 1, 1920; for such recovery of the sum of $5,000 and interest at six per cent. from February 26, 1921, the amount of said mortgage notes held by others than the parties; but the judgment should provide that should the said second-mortgage .notes, or any of them, be returned to plaintiff before payment of said judgment, the amount thereof shall be credited upon said judgment and stand a partial satisfaction thereof to the amount of the notes so surrendered; and said judgment should require payment by said two defendants of the taxable costs and disbursements of the action.     Let judgment be entered accordingly."

From judgments entered accordingly in each case the defendant the *Bradley Polytechnic Institute* appealed.

*W. E. Atwell* of Stevens Point, for the appellant.

For the respondents there was a brief by *Lehner & Lehner* of Princeton, and oral argument by *Philip Lehner.*

The following opinion was filed May 6, 1924:

VINJE, C. J.     The ultimate question in this case concerns the liability of the defendant the *Bradley Polytechnic Institute.*     It is the only defendant that appeared and defended.     Numerous exceptions in its behalf are made to the findings of fact.     All, however, merge more or less in the determination of whether or not the evidence supports this finding of the court:

"The said contract was entered into by the defendant *Institute* for the purpose and with the intent of securing the services of said Erbes, who was a real-estate agent in the business of selling farm lands, in effecting sales of said lands, and with the purpose and intent thereby to avoid responsibility for fraudulent representations made or claimed to be made by said Erbes to purchasers in effecting sales thereof.     And it was contemplated by said *Institute* and by said Erbes that the said lands should be sold to farmers as and for farm lands adapted to general farming purposes as farming was generally carried on in the vicinity .of their

location, at prices far in excess of their actual value for such purposes, and with knowledge, on the part of said *Institute,* that they were in fact not adapted to general farming purposes and were of less actual value than they were listed at by said contract; and it was contemplated, in lieu of regular commissions for selling said lands, said Erbes should have all that he might be able to procure over and above the amount of payments specified in said contract to be made by said Erbes to said *Institute.* And it was contemplated by said parties that none of said lands should actually be taken by said Erbes except such as he should first succeed in selling to purchasers, and that all payments by Erbes to the *Institute* should be made from the payments made to Erbes by purchasers upon completion of sales."

The evidence supporting such finding is not, as might be expected, positive and direct but circumstantial. It rests to a large extent upon the following facts which the court could find the evidence established: The *Institute* was thoroughly familiar with the quality of the soil of the lands sold and knew that for agricultural purposes its value, as the court found, was not to exceed one half the price put upon it in the contract. It knew that Erbes, in order to get pay for his services, must ask a price higher than the listed one. It therefore knew a sale could not be made, if made upon representations at all, except upon fraudulent ones. It had previously sold lands through Erbes and had had to take them back because of fraudulent representations. It was constantly informed of the progress and status of sales made, and knew, as the court found, that no sales would be made to Erbes until he had resold.

The above are some of the salient facts from which the court found that the *Institute* entered into the contract with Erbes with the intent and knowledge that the prospective purchasers from Erbes were to be induced to buy the lands through fraudulent representations by Erbes or his agents at prices over twice the value of the land. We therefore arrive at the conclusion that the trial court was warranted in finding from the evidence that a fraudulent scheme to sell

the lands was entered into by the *Institute* and Erbes to the prospective profit of both. This being so, the liability of the *Institute* follows as a matter of course.

The contract between the *Institute* and Erbes is an option contract for the purchase of land, and there is nothing within its four corners that spells fraud or that by its terms attaches liability to the *Institute* for the representations of Erbes. On the contrary, the contract provides there shall be no such liability. But the contract does not tell the whole story. It is only an apparently innocent and lawful link in a fraudulent scheme, and it is the purpose and effect of the scheme that governs, and not the language of an agreement which is only a part of the scheme. Fraud delights in choosing innocent and lawful carriers for its execution. When it does so, parol evidence is admissible to show that a writing innocent and valid on its face is part of a fraudulent scheme. *Miller v. Anderson,* 183 Wis. 163, 196 N. W. 869.

It seemed to be the view of counsel for the *Institute* that if the contract in question was not on its face a contract of hire there would be no liability on the part of the *Institute*. Such view was faulty in that it did not recognize that fraud might be spelled from the transactions taken as a whole, though it could not be spelled from the contract alone. Such a contract of an option to sell is not a contract of hire, and from it alone no liability on the part of the "owner" for representations made by the "buyer" would follow. But when it is shown, as it was here, that the contract is only one link in a fraudulent scheme, liability on the part of the "owner" may follow in spite of the contract.

We think the trial court correctly held that there was liability on the part of the *Institute* for the fraudulent representations made by Erbes and Tillia.

*By the Court.*—Judgment in each case is affirmed.


A motion for a rehearing was denied, without costs, on October 14, 1924.