MILLER, Appellant, vs. ANDERSON, Respondent.

*December 12, 1923—March 11, 1924.*

*Champerty: Contracts to procure testimony: Parol evidence to explain nature of contract: Agreement to investigate facts: Validity: Fraud: Information obtained during employment: Duty of disclosure to customer of employer.*

1. Champertous contracts are void and will not be enforced; and contracts to pay for procuring testimony to be used in evidence, and conditioning the contractee's right to compensation on the character of the testimony procured or the result of the suit in which it is to be used, are contrary to public policy, since such agreements hold out an inducement to commit fraud or procure persons to commit perjury.  p. 168.

2. Parol evidence is competent to show that a writing valid on its face is a mere cover for an illegal transaction.  p. 169.

3. Where plaintiff, an accountant, acting on information obtained from his former employment with a packing company, contracted in writing with a shipper of live stock to investigate his accounts with the company, the shipper agreeing to divide equally all moneys which might be received as a result of such investigation, and parol evidence of the negotiations leading up to the contract failed to reveal that either party believed litigation necessary or likely in the collection of any amount found to be due, or that if court action should result plaintiff would be a material witness, the contract is not void as opposed to public policy.  p. 173.

4. Where a successful farmer and bank president, so accustomed to transactions involving sums of money that he did not miss payments amounting to over $3,000 for shipments of live stock, deliberately agreed to pay plaintiff one half of whatever moneys might come to him through the use of information in plaintiff's possession, which he knew plaintiff would not reveal except for compensation, and as a result came into possession of a considerable sum of money, plaintiff's conduct was not fraudulent because he concealed the name of the debtor, the amount due, or the fact that plaintiff acquired his information while in the employ of the debtor.  p. 173.

5. The plaintiff sustained no such relation towards the defendant as to impose upon him the duty of disclosing the company's indebtedness to defendant, the packing company not being of a *quasi*-public character, and the parties having dealt at arm's length.  p. 175.

APPEAL from a judgment of the circuit court for Monroe county: E. C. HIGBEE, Circuit Judge. *Reversed.*

The plaintiff in this action was in the employ of the Interstate Packing Company at Winona, Minnesota, from the 22d day of February, 1921, to the last day of February, 1922, as office manager and credit man. He was an experienced bookkeeper and, as a part of his duties, supervised the bookkeeping. During the first six weeks of his employment the superintendent of the packing company, during a conversation in which the superintendent criticised the business methods of the company and reflected upon its honesty and square dealing, told the plaintiff that the packing company owed a stock shipper at Tomah a large sum of money. After plaintiff left the employ of the company he recalled this conversation and conceived the idea that the stock shipper at Tomah might be willing to pay something for this information, but he did not know the latter's name. He went to Winona, called up the bookkeeper of the company, and ascertained the name of the stock shipper of Tomah to be that of the defendant. He went to Tomah, interviewed the defendant, and told him he knew of a party that was owing him a considerable sum of money. He at first stated that the party lived at La Crosse. Defendant replied that there was only one party in La Crosse who owed him money and that it did not exceed $300 or $400. The plaintiff then suggested that he could give him $400 for the claim and have enough left to pay him for his trouble. Upon this visit it was evidently the purpose of the plaintiff to purchase the account. During the negotiations the defendant sought to procure the name of the debtor, but this the plaintiff steadily refused to reveal. This was on Saturday, and nothing came of their negotiations. Plaintiff, however, returned to Tomah on Monday. Negotiations were resumed, and the defendant finally agreed to sell the claim against whomever it might be for $400, the same to be paid after plaintiff should make collection. They proceeded to a lawyer's office

Miller v. Anderson, 183 Wis. 163.

for the purpose of having an assignment of the claim pre-
pared. During all this time defendant importuned the plaint-
iff to reveal the name of the debtor. Plaintiff persistently
refused so to do. While in the lawyer's office defendant re-
fused to execute the assignment. The attorney then sug-
gested that they enter into a contract by which defendant
was to pay plaintiff fifty per cent. of any amount which
might be collected from the alleged debtor. This was agreed
to. Plaintiff then stated that the debtor was the Interstate
Packing Company at Winona. Defendant expressed the
opinion that the Interstate Packing Company owed him
nothing. A contract was drawn up, however, of which the
following is a copy:

"Whereas, the said party of the first part has, prior hereto,
had certain business dealings with the Interstate Packing
Company, a corporation, of Winona, state of Minnesota,
said business transactions consisting of shipping and selling
hogs to the said Interstate Packing Company; and

"Whereas, it is the belief of both the party of the first
part and the party of the second part that the said Interstate
Packing Company of Winona, Minnesota, has not fully paid
the said party of the first part for all merchandise sold by
the party of the first part to the Interstate Packing Com-
pany; and

"Whereas, the said party of the second part is an auditor
and accountant and is desirous of making such investigation
as he deems necessary in order to determine whether the
said party of the first part has received all moneys rightfully
due and owing the party of the first part for merchandise
sold said corporation:

"Now, therefore, it is agreed by and between the parties
to this contract that the said party of the second part will
make such investigation of shipments and such other inves-
tigation of sales made by said party of the first part of hogs
to the Interstate Packing Company, and if it is ascertained
that there is a balance due the said party of the first part
and the same can be collected from the Interstate Packing
Company, that the said party of the first part and the said
party of the second part will divide all moneys received from

the Interstate Packing Company, owing to the said party of
the first part, equally; that is, the said party of the first part
is to receive fifty per cent. (50 %) of the moneys received
and the party of the second part is to receive fifty per cent.
(50 %); that all money as it is received is to be divided
equally.

"It is further agreed by and between the parties that the
said party of the second part will commence to make his in-
vestigation and audit as promptly as possible and that the
said party of the first part will assist the said party of the
second part by turning over to the said second party such ac-
count sales and other written memorandums of sales made
by the first party to the Interstate Packing Company."

Upon execution of this contract plaintiff and defendant
went to the depot of the Chicago, Milwaukee & St. Paul
Railway Company at Tomah for the purpose of examining
the records to ascertain the number of carloads of stock
that the defendant had shipped to the Interstate Packing
Company. This information was obtained. It appears to
have been the custom for the Interstate Packing Company,
upon receipt of a carload of stock, to send the shipper a sales
slip showing the weight of the stock at Winona, the price,
and the amount due for the carload. They then commenced
a search for these sales slips. They had not been preserved
by the defendant in any orderly or systematic manner, and
the search was instituted in the stock shipper's office at the
railway station, at defendant's home, and through his old
coat pockets. Eventually sales slips tallying with the rec-
ords of carload shipments at the depot were found. They
then repaired to the bank, of which defendant was president,
at Tomah, and investigated the credits to defendant's ac-
count in that bank. Credits to his account corresponding to
all sales slips except two were found. It thus appeared that
*Anderson* had not received payment for two carloads of
stock. They figured up the amount due for these carloads
of stock, amounting to something over $3,200, added interest

Miller v. Anderson, 183 Wis. 163.

for two years and a half, and made a draft on the Interstate Packing Company for the amount. When this was done plaintiff returned to his home at La Crosse, defendant prom-. ising to send plaintiff a check for his portion of the amount realized on the claim. The draft was returned unpaid. Thereafter plaintiff again went to Tomah, canvassed the situation with the defendant, and discussed the means which should be adopted to secure payment. Plaintiff suggested that defendant place it in the hands of an attorney as a collection item. This was not favored by the defendant, who expressed the opinion that he could go to Winona and secure a settlement. It was agreed that within a couple of days defendant should go to Winona to endeavor to secure a settlement of the account. A number of days thereafter plaintiff called defendant on the telephone and asked him if he had been to Winona. He replied in the affirmative and said that he had settled with the packing company for $3,750. Plaintiff then suggested that he send him a check for his share. Defendant demurred, and said that he wanted to see him first. It was agreed that plaintiff should go to Tomah on the next train. *Anderson* met him at the depot and offered him $500, stating that he had been advised that the contract was unenforceable and that he would not pay him any more. Plaintiff then commenced this action. It was tried before the court and a jury. At the conclusion of the evidence the court directed a verdict in favor of the plaintiff for $2,116. Upon this verdict judgment was duly entered in favor of the plaintiff. Thereafter the court by its order vacated the judgment so entered, and rendered judgment in favor of the defendant dismissing plaintiff's complaint. From this judgment, and order denying a motion to vacate the same, plaintiff brings this appeal.

For the appellant there were briefs by *John F. Doherty* and *Cowie & Hale,* all of La Crosse, and oral argument by *Mr. Quincy A. Hale* and *Mr. Doherty.*

For the respondent there was a brief by *Grady, Farns-worth & Walker* of Portage, and oral argument by *Daniel H. Grady.*

The following opinion was filed January 15, 1924:

Owen, J.    Defendant and respondent contends that the contract by which he agreed to give the plaintiff one half of what might be recovered upon the claim is void as being contrary to public policy, in that (a) it was champertous; (b) it held out an inducement to commit or induce the commission of fraud or perjury; and (c) it constituted an agreement whereby a person is to receive more than the statutory witness fees for appearing and testifying to facts within his knowledge.

That a champertous contract is void and will not be enforced is a trite proposition.    Contracts to pay for collecting and procuring testimony to be used in evidence, coupled with a condition that the contractee's right to compensation depends upon the character of the testimony procured, or upon the result of the suit in which it is to be used, have been uniformly condemned by the courts as contrary to public policy, for the reason that such agreements hold out an inducement to commit fraud or procure persons to commit perjury.    Thus, a contract to pay a physician a percentage of the recovery for acting as an expert in a personal-injury action is against public policy. *Davis v. Smoot,* 176 N. C. 538, 97 S. E. 488; *Sherman v. Burton,* 165 Mich. 293, 130 N. W. 667; *Thomas v. Caulkett,* 57 Mich. 392, 24 N. W. 154.    This principle was thoroughly considered and firmly established in *Manufacturers & M. I. Bureau v. Everwear H. Co.* 152 Wis. 73, 138 N. W. 624, which makes a present extended reference to authorities unnecessary.

Likewise, it has been held (*Clifford v. Hughes,* 139 App. Div. 730, 124 N. Y. Supp. 478; *Cowles v. Rochester F. B. Co.* 179 N. Y. 87, 71 N. E. 468; *Dodge v. Stiles,* 26 Conn. 463; *Wright v. Somers,* 125 Ill. App. 256) that an agree-

ment to pay a witness more than the statutory witness fees for appearing and testifying to facts within his knowledge is contrary to public policy and void. This is especially true where the compensation is dependent upon the successful outcome of the litigation. *Bowling v. Blum* (Tex.) 52 S. W. 97.

It will be observed that these several principles involve a common element, namely, existing or contemplated litigation. Such contracts are held to contravene public policy because they tend to the perversion of justice. It is therefore necessary to examine the contract between the parties for the purpose of ascertaining whether it contemplated the institution of any action or proceeding and the rendition of any service or assistance on the part of the plaintiff condemned by the foregoing principles.

It must be conceded that the contract on its face does not provide for the institution of any litigation nor does any suggestion appear therefrom that either of the parties had any such thought in mind. But in cases such as this we are not confined to a consideration of the written contract. Parol evidence is competent to show that a writing valid on its face is a mere cover for an illegal transaction. *Manufacturers & M. I. Bureau v. Everwear H. Co.* 152 Wis. 73, 138 N. W. 624. The answer alleges that the written contract was and is a part of an attempt to cover a simultaneous oral understanding and agreement between the parties which does offend against the foregoing principles. Parol evidence of the negotiations leading up to the written contract was therefore admitted, and must be considered in this connection. But the parol evidence fails to reveal any thought at any time on the part of either of the parties that litigation with the packing company would be necessary or likely. In fact, it was not suggested by either party so far as the parol evidence discloses. The nearest approach to such a suggestion occurred after the contract had been executed and after the draft made upon the packing company had been returned

unpaid. The parties then went to a lawyer's office, and the plaintiff suggested that the account be placed with a lawyer to be handled in the form of a collection. But the defendant did not like that. He thought he knew the vice-president and stock-buyer of the packing company and that he could make a settlement with him. He went to Winona and effected a settlement with him. The record discloses a situation where the defendant had simply lost sight of the fact that he had not been paid for two carloads of stock shipped to the packing company. When he was first told that the packing company was the debtor which the plaintiff had in mind, he could not believe that the packing company owed him anything. It was plaintiff's task to get together defendant's records and accounts and the records of the railway company for the purpose of informing plaintiff of the true situation of affairs. Plaintiff knew that the packing company knew that they were owing the defendant. Certainly plaintiff did not assume that litigation would be necessary to enforce collection. There was no agreement, expressed or implied, that plaintiff would bear any part of the expense of the litigation. There is no evidence to show that it was assumed by either party that, even if litigation should result, plaintiff would be a necessary witness. As we now view the case, we are at a loss to divine the character of the evidence which plaintiff could have given had litigation resulted that would have been in any sense substantial or material. Plaintiff's case would have been proved by showing that he had shipped a certain number of carloads of stock. This could have been shown by the records of the railroad company. Defendant's own testimony would have been sufficient to show that he had not been paid for two carloads so shipped. It would then have devolved upon the packing company to prove payment. Any testimony that the plaintiff might have given would have been so remote and of so little weight or materiality that it cannot characterize the contract as one having for its purpose the influencing of litigation. To

condemn this contract as one against public policy is to carry the principles invoked by the respondent to a prudish extreme, and would compel a holding that a business man whose accounts have become confused or involved may not employ an accountant to audit them for a compensation contingent upon the amount eventually collected. To such an extreme we are not prepared to go, where the gist of the contract is not to promote successful litigation but rather to place the client in the possession of the true facts concerning his affairs and accounts.

The legality of this and similar contracts is illustrated in the English case of *Sprye v. Porter*, reported in 26 L. J. Q. B. 64, 3 Jur. N. S. 330, 5 W. R. 81, 119 Eng. Rep. (Full Reprint) 1169. In that case the declaration set forth that plaintiff and another, having in their possession certain documents and information which would establish defendant's right to certain property not then in his possession or control, nor of which he was then aware, entered into an agreement with the defendant by which they agreed to give defendant the documents and information in their possession, the defendant agreeing to pay them each one fifth of the value of the property which should actually come into his possession, and it was agreed that defendant should not be compelled, for the purposes of that agreement, to take any proceedings at law or in equity to recover said property or any part thereof. Plaintiffs alleged compliance with said agreement on their part, the recovery of property of great value by the defendant as the result of the information furnished, and the refusal of the defendant to give to them one fifth of the property so obtained. Of this agreement Lord CAMPBELL, C. J., said:

"No statute, nor decided case, nor dictum, was cited at the bar, showing that there is any illegality in this agreement. No suit was depending; and there is no stipulation for the commencement of any suit for the recovery of this property. The plaintiff and Rosaz were merely to communi-

cate certain documents and information then in their possession to the defendant; and, having done so, they were to do no more. The documents and information must be presumed to be genuine and sincere. The property might well be recovered without any litigation, the documents and information communicated making out a clear and conclusive title in the defendant to recover it. At any rate, the defendant was not to be forced into litigation; and, if he did resort to litigation, the plaintiff and Rosaz were not to furnish him with money to carry it on, or to provide him with any further evidence, or in any way to assist or to countenance him. There seems abundant consideration for the defendant's promise, both in what the plaintiff and Rosaz did, and in the advantage which the defendant was to derive therefrom. And his promise was merely to make over a portion of that which was his own. We therefore do not think that the agreement at all savours of maintenance or champerty or is in any way contrary to public policy."

The seventh plea to the declaration, however, alleged that the written agreement was merely colorable and was resorted to as a mere cover to conceal the real agreement between the parties, and alleged that the plaintiff and Rosaz agreed that they would supply the defendant information and evidence in case proceedings at law for the recovery of the property became necessary, and that if by means of such information and evidence the defendant should actually recover the property he would pay each of them one fifth of the amount. Of this agreement, which, it will be seen, was quite different from the written agreement, Lord CAMPBELL said:

"Here we have maintenance in its worst aspect. The plaintiff and Rosaz, entire strangers to the property which they say the defendant had title to, but which is in the possession of another claiming title to it, agree with him that legal proceedings shall be instituted in his name for the recovery of it, and that they will supply him, not with any specified or definite documents or information, but with evidence that should be sufficient to enable him successfully to recover the property. Each of them is to have one fifth of the property when so recovered; and, unless the evidence

with which they supply him is sufficient for this purpose, they are to receive nothing. They are not to employ the attorney or to advance money to carry on the litigation; but they are to supply that upon which the event of the suit must depend, evidence; and they are to supply it of such a nature and in such quantity as to insure success. The plaintiff purchases an interest in the property in dispute, bargains for litigation to recover it, and undertakes to maintain the defendant in the suit in a manner of all others the most likely to lead to perjury and to a perversion of justice. Upon principle such an agreement is clearly illegal."

The agreement here involved is very much like the one declared upon in *Sprye v. Porter, supra,* and is entirely lacking in the elements set forth in the plea which it was held rendered it an illegal contract. We have therefore come to the conclusion that the contract here in question cannot be avoided as one opposed to public policy.

It is next contended that the contract was procured by fraud, the fraud consisting in the concealment by the plaintiff of facts which it was his duty to reveal to the defendant, among which were the name of the debtor, the amount owing, and the fact that he had acquired this knowledge while he was in the employ of the packing company. We can discover nothing fraudulent in plaintiff's conduct. If two men ever dealt at arm's length, these men did. Defendant knew that plaintiff knew the debtor. He also knew that plaintiff did not propose to reveal the name of the debtor unless he was compensated for the information. He also well knew that whatever information the plaintiff had concerning the amount which was owing, the plaintiff entertained no purpose of disclosing that amount. The manner in which he acquired the information was in no sense material unless acquired under such circumstances as would make it his legal duty to disclose the information to the defendant,— a matter which we will discuss later.

We have, then, the defendant, a man of mature years, a successful farmer, president of a bank, engaged in the shipment of live stock, so accustomed to transactions involving

sums of money that he did not miss payments amounting to over $3,000, deliberately dealing with the plaintiff, agreeing to pay him one half of whatever money might come into his possession as the result of information in the possession of the plaintiff which he knew the plaintiff did not propose to reveal except for compensation. If plaintiff refused to reveal any facts which would have been helpful in enabling the defendant to exercise intelligent judgment, the defendant knew that such facts were being concealed, and he knew also that there was no way for him to acquire the information except by treating with the plaintiff upon terms mutually agreeable. Knowing all this, he entered into the contract in question. If he bought a "pig in a poke" he did so deliberately and in the exercise of his best judgment, and, in the light of subsequent events, it is difficult to say that he did not make a good bargain. It seems quite likely that as a result of the agreement he came into possesssion of a considerable sum of money which otherwise he never would have realized.

It is next contended that because the plaintiff was the bookkeeper of the packing company he, sustained a *quasi*-confidential relation towards the defendant so as to impose upon him the legal duty of disclosing to the defendant the facts with reference to the packing company's indebtedness to the defendant. Upon this proposition we are referred to the case of *Gierth v. Fidelity Trust Co.* 93 N. J. Eq. 163, 115 Atl. 397, 18 A. L. R. 976, in which it is held that an employee of a bank or trust company whose duties are concerned with depositors' accounts holds at least a semi-confidential relation towards the depositor. It will require but a moment's reflection to appreciate the difference between the relation existing between an officer or employee of a bank or trust company and a depositor, and the relation existing between the plaintiff, as an employee of the packing company, and the defendant. Banking institutions are of a *quasi*-public character. They are subject to public supervision and examination. Their depositors often repose great

Miller v. Anderson, 183 Wis. 163.

trust and confidence in them. Their advice on financial concerns is frequently sought. They are relied upon to keep accurate accounts for their customers and depositors. It is known that their books must balance, and that in case of a discrepancy the error is generally found to be that of the depositor. No such relation existed between the packing company and the defendant. The packing company was under no obligation to keep the accounts of the defendant. They were dealing at arm's length. If the defendant had overlooked the fact that the packing company was owing him $3,000, there was no legal duty on the part of the packing company to remind him of the fact whatever may be said concerning its duty as a matter of business ethics. The fidelity of the plaintiff was owing to the packing company. He was in no manner responsible for its business policies, and so long as he remained an employee it was his duty to conform to and abide by the lawful policies and practices of his employer. Certainly he occupied no relation of trust or confidence towards the defendant. We discover no theory upon which it can be said that the plaintiff owed the defendant a legal duty to inform him of the state of his accounts with the packing company.

Lastly it is argued that the plaintiff's conduct in acquiescing in certain bookkeeping entries on the books of the packing company with reference to defendant's account amounted to a violation of certain criminal statutes of the state of Minnesota. As to this, we deem it sufficient to say that we do not consider the point well taken. We see no purpose in a further discussion thereof.

*By the Court.*—Judgment reversed, and cause remanded with instructions to render judgment in favor of the plaintiff and against the defendant in accordance with the verdict of the jury.

A motion for a rehearing was denied, with $25 costs, on March 11, 1924.