## PHILLIPS PETROLEUM CO. v. DANIEL MOTOR CO.

### No. 2117.

Court of Civil Appeals of Texas. Eastland.

March 14, 1941.

Rehearing Denied April 4, 1941.

E. H. Foster and Tom D. Lumpkin, both of Amarillo, for appellant.

Harrell & Bowers, of Breckenridge, for appellee.

GRISSOM, Justice.

Phillips Petroleum Company sued Daniel Motor Company for $1,118.56. Plaintiff and defendant are corporations. In the first count of plaintiff's petition it was alleged, in substance, that on all the dates mentioned in the petition plaintiff was engaged in distributing gasoline, oil, etc., through W. M. Mitchell, its bulk station agent at Wichita Falls. There followed allegations that on certain dates Mitchell sold and delivered to defendant certain products shown by Phillips Petroleum Company's invoices attached to the petition; that on January 19, 1939, plaintiff presented its statement to defendant and defendant, acting through its bookkeeper, Mr. Luddington, at the instance and request of Mr. Padgett, defendant's manager and secretary-treasurer, certified plaintiff's statement of the account was correct. That the certification constituted the account sued upon an account stated.

In an alternative count, plaintiff alleged it was engaged in distributing gasoline, etc., through its bulk station agent, W. M. Mitchell; that beginning in March, 1935, and continuing through January, 1939, monthly statements were mailed to defendant by plaintiff, which, beginning with June, 1935, and continuing through January, 1939, reflected balances due by defendant to plaintiff for gasoline, etc., delivered to defendant by Mitchell; that defendant neither objected to the correctness of the balances shown by the statements, nor made any inquiry into the manner in which the account was being handled by Mitchell, although during all of said time defendant was paying for the gasoline, etc., delivered to it by Mitchell; that by reason of the fact that the invoices shown in the monthly statements sent to defendant varied from the invoices delivered by Mitchell, or his driver, to defendant, at the times defendant bought and paid for petroleum products, the defendant had actual notice that deliveries of gasoline, etc., were being made by Mitchell to someone other than defendant, and that Mitchell was invoicing such deliveries in the name of defendant by fictitious credit invoices forwarded to plaintiff, thus enabling Mitchell to dispose of gasoline, etc., reflected in said monthly statements, either to the defendant or to some other person and to appropriate the proceeds derived therefrom to Mitchell's use and benefit. Plaintiff again alleged in this count the certification to the correctness of the account in the sum of $1118.56 by defendant January 19, 1939. Plaintiff alleged, in the event defendant did not have actual knowledge that Mitchell was appropriating the balances reflected in the statements to his own use and benefit, defendant had constructive notice thereof by reason of the circumstances and facts alleged and was, therefore, under a duty to object to the correctness of the statements mailed to defendant, or to inquire into the manner in which the account of defendant with the plaintiff was being handled by Mitchell; that if defendant had objected to the accounts, or had inquired into the manner in which they were being handled, plaintiff would have been apprised of the fact that Mitchell was diverting the balances reflected in the statement to his own use and benefit and would not have sustained the damages alleged. That by reason of said acts of the defendant plaintiff had been damaged in the sum of $1,118.56, the amount misappropriated by Mitchell.

Defendant, among other things, answered by general denial. It denied the account sued upon constituted an account stated because it was not founded upon any previous transactions creating the relation of debtor and creditor between the parties. It alleged defendant did not owe plaintiff anything; that no account existed between the parties that could be stated; that the certification by Luddington on January 19, 1939 was without consideration; that there had been no previous transaction between the parties creating the relation of debtor and creditor, and there existed no account between the parties to be compromised or stated; that it had not sold or delivered to the defendant any of the merchandise listed in the account certified; that defendant had paid cash for all gas, etc., purchased from plaintiff and never asked for, nor received, credit from it; that, therefore, the account sued upon did not constitute a stated account and the certificate as to its correctness was void, being without consideration, and could not create an original liability where no liability previously existed. That beginning in January, 1935, and continuing through January, 1939, defendant purchased certain merchandise from plaintiff's bulk station agent, Mitchell, who was acting within the scope of his employment; that the invoices, copies of which were at-

tached to plaintiff's petition were forgeries; that the only purchases made by defendant from plaintiff were evidenced by certain invoices of the Phillips Petroleum Company delivered to defendant by Mitchell at the time he delivered products to the defendant, and at which times the defendant paid for all the products received. That payments were made by check of the defendant, or partly by such check, partly by the defendant's coupons and courtesy card invoices, or defendant's employees' invoices, and at each such time defendant received from plaintiff a receipt acknowledging payment for all the products delivered to the defendant, said receipt being indorsed on plaintiff's invoices by plaintiff's employee making delivery of said products. That defendant was not indebted to plaintiff in any amount.

Defendant then alleged, in substance, that with the knowledge and consent of plaintiff there was an agreement between defendant and Mitchell that defendant would pay Mitchell one-half cent per gallon more than the tank price for gasoline to induce Mitchell to deliver the gasoline to defendant one hundred miles from Wichita Falls. That Mitchell and the bulk station at Wichita Falls were in plaintiff's Tulsa Division, and defendant was in plaintiff's Amarillo Division. That plaintiff used a system of double-billing for the products sold to defendant; that plaintiff would deliver to defendant an invoice acknowledging payment for goods delivered to defendant at the time the products were delivered, and thereafter at the end of the month defendant would receive a statement from plaintiff; that beginning with June, 1935 defendant received a statement from plaintiff showing a balance due; that defendant objected to said statement and pointed out that defendant had paid for all purchases; that defendant's agent, Mitchell, represented that said statement did not mean anything; that defendant need not pay attention to said statement; that by reason of the one half cent additional paid to Mitchell for his long haul in delivering gasoline to defendant, and by reason of the location of Mitchell and plaintiff's bulk sales station and defendant in different Divisions of plaintiff's system that plaintiff used this system of double-billing; that for a period of about eighteen months, either before or about the time of the arrival of a statement from plaintiff's Tulsa office showing an indebtedness owing by defendant to plaintiff defendant re-

ceived from plaintiff's agent, Mitchell, a receipt therefor. That defendant continued to disregard the statements from the Tulsa office; that defendant never made any payment in response to the statements from plaintiff's Tulsa office, or otherwise to the plaintiff, except to Mitchell, or his truck driver, who delivered the petroleum products to defendant, at the time the products were so delivered. That defendant never received any requests from plaintiff's Tulsa office to make any payments on any of the statements rendered by it, other than the statements themselves, until after a period of nearly four years, in February, 1939, plaintiff requested payment and defendant informed plaintiff that defendant had paid for everything purchased and owed plaintiff nothing. That defendant believed the representations made to it by plaintiff's agent, Mitchell, to the effect that the double-billing and statements sent out by plaintiff's Tulsa office were merely routine and the method of carrying on plaintiff's business between its Tulsa and Amarillo Divisions, and in order to allow Mitchell to collect his extra commission for making delivery of said products to Breckenridge, and, by a course of dealing over a number of years from 1935, had been led to believe that said representations were true, and believed the verification of the statement was a mere routine bookkeeping matter between the two Divisions; that Mitchell was the only agent of plaintiff with whom defendant had carried on its gasoline and oil business; that plaintiff knew at all times defendant was not indebted to it in any amount; that defendant's verification of plaintiff's statement, in January 1939, was procured by fraud. Defendant denied that it ever had actual or constructive knowledge that Mitchell was misappropriating funds paid him by defendant for plaintiff's products; that upon the delivery of gasoline, etc., to defendant by Mitchell defendant would deliver to Mitchell Phillips Petroleum Company coupons, or credit card invoices, or employees' invoices and defendant's check in payment for the goods delivered; that said checks were payable to Phillips Petroleum Company and indorsed by Phillips Petroleum Company and returned to drawee bank and charged to the account of the defendant; that defendant had no knowledge that either the checks or coupons were being misappropriated by Mitchell; that, other than sending out the monthly statements from the Tulsa office, "nothing further was ever said by the Tulsa

office about collecting the amount shown to be due by said statements; and for a period of almost two years defendant received receipts for the payment of the amount specified in said statements upon the stationery of Phillips Petroleum Company, said receipts being signed, 'Phillips Petroleum Company by W. M. Mitchell, Agent', and the said W. M. Mitchell, continued to assure defendant that everything done was in accordance with the rules and regulations of the plaintiff." That defendant relied upon such assurances of Mitchell and such statements and receipts; that said practice continued for more than four years without any question by plaintiff's Tulsa office; that plaintiff never at any time prior to January, 1939, made any attempt to check said account with defendant in order to ascertain the true facts; never made any effort to collect the amount claimed to be due by said statements; that if misappropriations of funds were made by Mitchell, it was the result of plaintiff's negligence in failing to follow up the statements and in accepting payment from Mitchell and in not making any effort to check the account of Mitchell with defendant; that neither the defendant nor its manager, Padgett, had any knowledge, actual or constructive, of the misappropriation of funds by Mitchell and it was under no obligation or duty to report misappropriations to plaintiff.

Attached to the answer were Phillips Petroleum Company invoices on which printed forms a receipt showing payment for the products actually sold to the defendant was signed by the employee receiving payment, as was plainly contemplated by said Phillips Petroleum Company invoice form. The part of such a Phillips Petroleum Company invoice here material is as follows:

"Delivered by    Received Payment
                 L. R. Wilson
                 _____
                 Employee Receiving Money Sign here
L. R. W.
_____
Received above merchandise in good order and I, or we, agree to pay above amount at the Amarillo Division office of company, City of Amarillo, Potter County, Texas.
                 Steve Cozby
                 _____
                 Customer sign here
_____
Make all checks payable to the company."

· It is undisputed that defendant paid for all of plaintiff's products sold and delivered to it at the time the products were delivered. That all checks were made payable to Phillips Petroleum Company. It is undisputed that the invoices contained in the monthly statements sent out by plaintiff's Tulsa office were fictitious and prepared by Mitchell. It is undisputed that defendant paid Mitchell, or his gasoline truck driver, for all products received, never made any payment to plaintiff's Tulsa office, and never asked plaintiff for credit. The trial was to the court. The court rendered judgment for defendant and plaintiff has appealed.

The following excerpts from the testimony reveal the contentions of the parties and the fact situation:

R. E. Padgett, defendant's manager, testified:

"State whether or not the invoices which accompanied the statement which you received in June, 1935, from Phillips Petroleum Company indicated that they had been signed by a person in the employ of Daniel Motor Company who actually received the products? A. It had our employee's name on it but it was a forgery.

"Q. Did you know it was a forgery at that time? A. No, sir, we did not.

"Q. When did you first discover that it was a forgery? A. After all this disturbance came up.

"Q. When did you first discover the invoice numbers on these statements were different? A. After all this trouble arose.

"Q. As a matter of fact, did you ever examine any of those invoices and statements at all? A. Yes, I examined them to a certain extent.

"Q. To what extent did you examine the invoices and statements for June, 1935? A. Well, when we received the first statement I mentioned it to Mitchell to find out what the thing meant.

"Q. Didn't you notice at that time that the invoice numbers were not the same? A. Well, his statement to us was not what ...

"Q. Just a minute. Just answer my question. Didn't you notice at that time that the invoice numbers were different? A. Yes, we noticed some difference.

"Q. Didn't you notice the date was different? A. No, I didn't notice that.

"Q. But you did notice in the invoices that the amount was different, didn't you? A. Yes sir.

"Q. Did you notice that the price per gallon was different? A. Yes sir, but I knew that was right, because ...

"Q. Well, just answer my question. You knew that? A. Yes sir.

"Q. Now, Mr. Padgett, after you noticed that the dates were different and the numbers on the invoices were different and the amounts of the purported purchases were different, didn't you know that the signature on those invoices was a forgery? A. I never paid any attention to that. I didn't examine it close enough.

"Q. Had you ever seen those invoices before? A. These here?

"Q. Yes, those attached to the statement? A. Yes, I saw them when we received the statement.

"Q. Before receiving the statement, had you ever seen them before that? A. No sir.

"Q. Did you ask your employee who had signed the invoices that were attached to the statement whether or not he had signed them? A. No, I didn't.

"Q. To whom did you make any inquiry about the statement and the invoices attached to the statement? A. W. M. Mitchell.

"Q. What inquiry did you make of Mr. Mitchell? A. Well, I wanted to know his method of handling it and why they sent out that statement.

"Q. When did you ask him about that? A. Immediately after we received the first statement.

"Q. Did you go to Wichita Falls and talk to Mr. Mitchell about it? A. No, I called him up.

"Q. Long distance? A. Yes, sir.

"Q. And what did Mr. Mitchell say about it? A. He told me that was the manner in which they had of handling the thing so that he could receive his half cent commission for delivering the gasoline to us the hundred miles.

"Q. And the invoices we sent out to you were half a cent less than what you were actually paying? A. I didn't check that very close, but it was agreed at the time Mr. Mitchell began delivering gasoline to us to give him half a cent bonus for delivering the gas.

"Q. And that was reflected in any invoices out? A. No, naturally all of your invoices were a half cent lower than ours. That was the half cent he was to get. We knew that we were paying half a cent more per gallon.

"Q. Than the invoices we sent out reflected? A. Yes, but I never checked the price very close. Mr. Mitchell told us we were in the Amarillo division and they were putting us in the Tulsa division and that they had to cross bill it up there or something like that.

* * *

"Q. Did you notice all of these discrepancies at the time you received the statement from Phillips Petroleum Company? A. No, I didn't check them that close.

"Q. Didn't you notice there was a difference in the price per gallon? A. I knew there would be because that was our agreement.

"Q. Well, did you notice the numbers of the invoices were different? A. No, I didn't check it that close.

"Q. Did you check them at all at that time? A. No sir.

"Q. What did you do when you received that statement for October? A. I got hold of Mr. Mitchell.

"Q. You found him? A. Yes sir.

"Q. Did you call him long distance? A. He was either down here or we had received the receipt prior to receiving the statement.

"Q. Did you call him over the telephone? A. I couldn't swear that.

"Q. Would you say you talked to him or not? A. Not after receiving it.

"Q. How many times did you speak to Mr. Mitchell about the manner he was handling your account? A. I spoke to him every time we received one of those statements unless we had already received the receipt.

"Q. As long as you received the receipt from Mr. Mitchell you were satisfied. Is that right? A. Yes sir. He assured me everything was all right. We had his receipt for it.

"Q. Mr. Padgett, you and Mr. Mitchell are pretty close friends, aren't you? A. No sir.

"Q. But you had a lot of confidence in him, didn't you? A. Naturally. He had never done anything to betray my confidence in him.

"Q. And when he advised you that you would get a receipt for this you said that

would be all right? A. We had no reason to question Phillips Petroleum Company's way of handling it.

"Q. You didn't raise any question to it, except to Mr. Mitchell. Is that right? A. No, I told you it didn't make any difference with me as far as Phillips was concerned.

* * *

"Q. Did you notice the discrepancies in the statement you received and the invoices attached to it and the invoices in your records? A. No, the only thing we were interested in was receiving this receipt from Mitchell.

"Q. Did you examine the statement? A. No sir.

"Q. When did you quit examining the statements you received? A. Possibly, the only statement I ever looked at was the first one that we received. The only thing we were interested in was getting the receipt from Mitchell.

"Q. And you didn't look at any other statements? A. I didn't look at them close.

"Q. Didn't Mr. Luddington look at them? A. I don't know.

"Q. He is the bookkeeper isn't he? A. Yes sir.

"Q. Did you get a receipt from Mr. Mitchell covering February 1936? A. Yes sir.

"Q. And when you got that receipt you were satisfied? A. Yes sir.

* * *

"Q. I believe you said you checked the first one, didn't you? A. I didn't look at it very close.

"Q. But you did check the first one. Is that right? A. No, I just looked at it. It looked like a statement and I called Mitchell and asked him what it was."

With reference to the verification of the account on January 19, 1939, he testified:

"Q. Now when did Mr. Mitchell come down here to Breckenridge and tell you about wanting his account verified? A. I don't remember the exact date. It was along in January.

"Q. Did you tell him you would verify the account? A. Yes, I told him I would.

"Q. What transpired at that time; what time of the day did he come down? A. It was at night.

"Q. About what time at night? A. Oh, I would say between seven and eight o'clock; somewhere along there.

"Q. Where did you have this conversation with Mr. Mitchell? A. Down at the place.

* * *

"A. He came down to talk to us, I presume, about getting this tire account transferred to the Wichita office. He told me he was going to be transferred over into the Amarillo division and he wanted to handle this tire account. It had been a pretty good tire account and we had been selling a lot of tires. They had been shipping them out of Amarillo, and he went into the details how he could deliver the tire shipments by truck. He said that it would mean a little more to him, since he had a tire quota to make. About that time he got ready to leave and both of us got up and started out of the office and he said: 'By the way, in this transfer there will probably be someone down here in the next day or two and they will want you to verify the account.' He says: 'I wish you would go ahead and verify the thing. It is in the matter of the transfer of these accounts from the Tulsa office to the Amarillo office.' And I asked him what it was and he says: 'Oh, it is just a matter of office routine. There is no liability on your part. I assure that and that the account will be hereafter handled out of Amarillo office instead of the Tulsa office.' I told him I would do that if there was no obligation on our part and he says: 'I assure you that there won't be anything coming up about it. That's a matter of office routine and they have to handle it that way.'

* * *

"Q. Mr. Padgett, as a matter of fact, you knew this account wasn't being properly handled didn't you? A. No sir.

"Q. You knew it all the time didn't you? A. No sir.

"Q. And that's your testimony in this case? A. I thought that was the way Phillips Petroleum Company handled the account. I had no reason to believe otherwise.

"Q. You have alleged that we never did make any attempt to collect this account, haven't you? A. Collect what?

"Q. To collect these past due statements? A. That who didn't?

"Q. Phillips Petroleum Company? A. Yes sir.

"Q. Did you ever receive a letter from Phillips Petroleum Company reflecting that your account was past due and that you should get it in good shape? A. No sir."

Mr. L. J. Luddington, defendant's bookkeeper, testified:

"Q. Has Daniel Motor Company ever carried an account in its books covering accounts payable to the Phillips Petroleum Company? A. No, because we pay cash for all gasoline that we receive.

"Q. Mr. Luddington, did you ever know or happen to have any notice that W. M. Mitchell was misappropriating funds that you paid to him for the Phillips Petroleum Company? A. Well, the only time that I ever noticed anything was the first time we received a statement from Phillips Petroleum Company.

"Q. What did you do when you received that statement? A. Mr. Padgett laid it on my desk with the rest of the mail. I checked it over and called his attention to it, that we were charged with something like two or three hundred dollars. I don't remember the exact amount it was. I told him about it so he went to the telephone at that time and called Mr. Mitchell and talked to him about it. Later on we received a letter or a credit slip that Mitchell mailed us showing that it was paid.

"Q. What did Mr. Padgett tell you after he talked to Mitchell over the telephone at that time? A. He told me that Mitchell was sending us a credit slip.

* * *

"Q. Did you ever examine those statements you received from time to time from Phillips Petroleum Company? A. Which ones?

"Q. Any of them? A. Yes sir.

"Q. And when was that? A. June, I believe, was the first one we got.

"Q. And when you examined that one did you notice any discrepancies in the invoices and the statement? A. No, I just noticed they had us billed with that much and we didn't owe it. I never checked it close.

"Q. Do you open the statements, or who handles the mail down there? A. Mr. Padgett does when he is there and when he is not there I open it.

"Q. Did you ever examine any of the statements that you received after June, 1935? A. Not that I remember."

Mr. Watson, plaintiff's District Salesman, who had supervision of Mitchell's bulk sales station at Wichita Falls, testified:

"Q. What were your duties as district salesman? A. Supervision of operations, sales, collections and just the general operation of the territory. Bulk and service station dealer accounts were included.

"Q. Part of your duties were with the Wichita Falls bulk station? A. Yes sir.

"Q. How often did you visit that station? A. Well, on an average of about once a month, I would say.

"Q. Would you check over his accounts when you visited his station? A. From the analysis sheet, yes sir.

* * *

"Q. But as a part of your duties, you supervised the collection of his accounts. Is that right? A. That's right.

"Q. And in that capacity you had occasion to know about this Daniel Motor Company account, did you not? A. I had seen it reflected on the analysis sheet, yes sir.

"Q. Did you ever give Mr. Mitchell any instructions with reference to that account? A. Well, not until about December of 1938, or whichever month it was it first went past due, but whichever month it was that it first went past due I did ask him to collect it, yes sir.

"Q. What do you mean that it went past due? A. That means that it became other than a current account.

* * *

"Q. Did you ever say anything to Daniel Motor Company about the account prior to January, 1939? A. No sir.

"Q. You knew that it had been on the books of Phillips Petroleum Company all that time? A. Yes sir.

"Q. And you knew that it was running above the $500 credit limit you say they had? A. Yes sir.

"Q. And in spite of that you never did say anything to them about it? A. Not to the Daniel Motor Company, no sir.

"Q. And you never said anything to Mr. Mitchell prior to December, 1938? A. Whichever was the first month it went past due, but the first month it went past due I did say something to him about it, yes sir.

"Q. But you knew each month it was running over $500? A. Yes sir.

"Q. And with that knowledge you didn't say anything to Daniel Motor Company about getting their account below the credit limit did you? A. No sir.

\* \* \*

"Q. Now, that was in March, 1938? A. Yes sir.

"Q. What instructions did you give Mr. Mitchell about the account at that time? A. To bring it to a current basis.

"Q. What effort did you make to collect it? A. I didn't make any effort whatsoever myself.

"Q. Did you say anything to Daniel Motor Company about their account being past due? A. No sir.

"Q. Although at that time it showed a balance of $980.27? A. Yes sir.

"Q. And part of it was past due? A. That's right.

"Q. And most of it was above the credit limit and you said nothing about it? A. No sir, not to them."

Mr. Salts, assistant sales manager with defendant's Tulsa Division, testified:

"Q. Then Mr. Mitchell was the agent of Phillips Petroleum Company in handling the Wichita Falls bulk station. Is that right? A. That's right.

"Q. How long did he continue to be the agent for Phillips Petroleum Company? A. I can't give you the exact date, but it was about four years.

"Q. Until about when? A. Until the early part of January, 1939.

"Q. He was the agent of Phillips Petroleum Company when all of this gasoline was sold to Daniel Motor Company, was he not? A. He was.

\* \* \*

"Q. Had the account ever been called to your attention? A. It had been discussed with Mr. Ames when Mr. Mitchell and I were present.

"Q. What was the occasion for that conference? A. Mr. Ames, our Division Manager, called Mr. Mitchell to the office regarding some accounts, and in the conversation he brought up the Daniel Motor Company account and asked him if it was all right. Mr. Ames stated that it was a little larger than the credit he wanted to give and was running past due. Mr. Mitchell stated it was all right and would be in line within 30 days."

It is evident that at the time Luddington verified the account, plaintiff knew, or at least was suspicious, that Mitchell had misappropriated a large sum of money. There is no evidence that plaintiff, relying upon the verification of the account, did anything to its detriment or suffered any loss or injury of any kind by reason thereof. It is further evident that plaintiff knowingly permitted Mitchell to collect for its products from defendant from June, 1935, to the discovery of Mitchell's defalcation in 1939, and depended on Mitchell to remit to plaintiff. The evidence shows plaintiff depended on Mitchell to see that defendant's account "was all right", as did the defendant. Defendant never requested credit from plaintiff. Defendant's dealings were with Mitchell alone. Plaintiff and defendant dealt with each other at arm's length. There existed no fiduciary or similar relation of trust and confidence. The evidence justifies a conclusion that Mitchell's duties were to sell plaintiff's products at wholesale, collect and remit to plaintiff. It is evident defendant did not purchase any of the products listed in the account sued on. Plaintiff made no effort to collect said account until it learned Mitchell had misappropriated funds collected for plaintiff. Mitchell's accounts were audited by plaintiff every 60 to 90 days. Defendant's account, as reflected by plaintiff's Tulsa office records, became past due in March, 1938, then again in July, 1938, and continued past due until January, 1939. If Padgett had knowledge of Mitchell's defalcation such fact must be imputed to him because he received monthly statements from plaintiff's Tulsa office reflecting a balance due and he must have failed to rely, or had no right to rely, upon the explanations of Mitchell and receipts issued by him as plaintiff's agent. Here it must be remembered that Mitchell was the only representative of plaintiff with whom defendant dealt and that plaintiff's printed forms as well as plaintiff's actions, if Padgett's testimony is to be believed, as it was by the trial court, clearly evidenced Mitchell's right to collect and receipt for payment for plaintiff's products sold by Mitchell. There is no evidence that Padgett or defendant's bookkeeper, Luddington, profited by Mitchell's defalcation. The evidence certainly is not conclusive that there was collusion between Mitchell and any of defendant's agents or employees, nor that they had actual knowledge of Mitchell's defalcation, or designed to hide the facts from plaintiff. We call attention to the fact that there is neither allegation nor

proof that plaintiff depended or relied on defendant to disclose any fact to plaintiff.

Typical receipts showing payment of the monthly statements sent to the defendant are as follows:

"Phillips Petroleum Co.     July 6, 1935.

"Received of Daniel Motor Co., Breckenridge, Texas, $294.08. Two Hundred Ninety-Four & 08/100 Dollars, for July 1st Statement from Phillips.

"Phillips Petroleum Co.
        "By: W. M. Mitchell, Agent.

"Phillips Petroleum Co.     Wichita Falls
                                Station
                "July 6, 1935

"Mr. Padgett,
"Daniel Motor Co.
"Breckenridge, Texas.

"Dear Mr. Padgett:
"Attached please find receipt for $294.08 to cover statement from Phillips Petroleum Co. You will receive the statement within a few days. Please destroy the statement as you have already been credited with the balance shown on the statement.
        "Yours very truly,
        "Phillips Petroleum Co.
                "By: W. M. Mitchell, Agent."

"Phillips Petroleum Company
        "Wichita Falls Station, 4/3/1936
"Received of Daniel Motor Company, Breckenridge, Texas, $545.00, Five Hundred Forty-Five Dollars, for March contrawise invoices.
        "Phillips Petroleum Co.
                "By: W. M. Mitchell, Agent."

■ The court, among other things, found that defendant had paid for all products purchased from Mitchell; that defendant's manager, Padgett, in good faith, believed the account was being handled in accordance with plaintiff's requirements; that there was no collusion between Mitchell and Padgett and that defendant had no actual knowledge of Mitchell's misappropriations; that plaintiff had knowledge of the manner in which the account was handled.

■ We are of the opinion the evidence sustains such findings. It is not meant, of course, to say that plaintiff had actual knowledge of misapplication of funds by Mitchell prior to January, 1939. The nature of plaintiff's suit, as we understand it, is one in tort based upon fraudulent concealment by defendant. The applicable theory of liability, we think, is found in Vol. 3, Restatement Torts, sec. 551, as follows:

"(1) One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter which he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

"(2) One Party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated (a) Such matters as the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them."

■■ It would appear (the facts having been found by the trial court in favor of defendant) that liability of the defendant is not shown in the absence of conclusive proof that Padgett knew Mitchell was defaulting, and Padgett was under a duty to disclose the facts to plaintiff. Evidence that defendant received monthly statements from plaintiff's Tulsa office showing a balance due by defendant, taken in connection with Mitchell's explanation of the reasons for the statements being mailed to defendant, the receipts for the amount of such accounts issued by Mitchell as plaintiff's agent, the receipts for the purchase price of materials executed when the products were delivered, plaintiff's failure to otherwise request payment during a period of about four years, and all other relevant facts and circumstances, certainly cannot be said to show, as a matter of law, that defendant had knowledge of Mitchell's embezzlement of funds paid him by defendant. This is especially evident when it is remembered that plaintiff's printed invoice forms showed Mitchell was authorized to collect from defendant and issue a receipt therefor. However, if under such facts it should be held that defendant was charged with constructive notice of Mitchell's defaults, it would not result that defendant's failure to disclose such facts constituted fraud, as a matter of law. Generally there must be something more than failure to disclose known facts to constitute fraud. The facts must be such that defendant is charged with the legal duty to communicate them. The applicable rules

are stated in 23 Am.Jur. p. 851, et seq. as follows:

"The law distinguishes between passive concealment and active concealment, or, in other words, between mere silence and the suppression or concealment of a fact, the difference consisting in the fact that concealment implies a purpose or design, while the simple failure to disclose a fact does not. Mere silence is not representation.

"As a general rule, to constitute fraud by concealment or suppression of the truth there must be something more than mere silence, or a mere failure to disclose known facts. Where there is no obligation to speak, silence cannot be termed 'suppression' and is not a fraud. Either party may, therefore, be innocently silent as to matters upon which each may openly exercise his judgment.

"Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances. In other words, there must be a concealment, the party sought to be charged must have had knowledge of the facts asserted to have been let remain undisclosed, and the silence must, under the conditions existing, amount to fraud, because it amounts to an affirmation that a state of things exists which does not, and the uninformed party is deprived to the same extent that he would have been by positive assertion. Concealment in the sense opposed to mere non actionable silence may consist in withholding information asked for or in making use of some device to mislead, thus involving act and intention. The term generally infers also that the person is in some way called upon to make a disclosure. It may be said, therefore, that in addition to a failure to disclose known facts, there must be some trick or contrivance intended to exclude suspicion and prevent inquiry, or else that there must be a legal or equitable duty resting on the party knowing such facts to disclose them. Moreover, one will not be permitted to say that he was ignorant of the legal effect of a fact concealed, since no one will be heard to say that he is ignorant of the law.

"The principle is basic in the law of fraud as it relates to nondisclosure that a charge of fraud is maintainable where a party who knows material facts is under a duty, under the circumstances, to speak and disclose his information, but remains silent.

\* \* \*

"In order that suppression of the truth may constitute fraud, there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other and which the other party is entitled to have communicated to him.

\* \* \*

"Although the pertinent inquiry in any case where fraud on the basis of nondisclosure is asserted is whether, upon any particular occasion, it was the duty of the person to speak on pain of being guilty of a fraud by reason of his silence, except in broad terms the law does not attempt to define the occasions when a duty to speak arises. On the contrary, there has been adopted as a leading principle, the proposition that whether a duty to speak exists is determinable by reference to all the circumstances of the case and by comparing the facts not disclosed with the object and end in view by the contracting parties. The difficulty is not so much in stating the general principles of law, which are pretty well understood, as in applying the law to particular groups of facts.

\* \* \*

"Knowledge that the other party to a contemplated transaction is acting under a mistaken belief as to certain facts is a factor in determining that a duty of disclosure is owing."

In 20 Tex.Jur. p. 41, the rule is stated as follows: "One is not to be charged with fraud in suppressing information which he is not legally bound to volunteer. When, therefore, the parties are dealing at arm's length, there being no confidential relationship, mere silence is not fraud, either actual or constructive."

In 26 C.J. p. 1142, it is said: "\* \* where parties deal upon equal terms and no confidential relationships exist, neither is bound to disclose superior information he may possess and a charge of fraud cannot be based upon failure to do so \* \*."

In Higginbotham-Bartlett Co. v. Powell, Tex.Civ.App., 270 S.W. 193, 197, the court said: "Was failure of appellee to tell appellant that his calf crop was under mortgage such a suppression of the truth as

constituted fraud? According to the verdict and judgment, there was no willful suppression of the truth. According to the record, no fiduciary or confidential relations existed between the parties, no inquiry was made, no statement of appellee's financial condition requested, and none was given; the parties were dealing at arm's length and mere silence or failure to volunteer information is not fraud, either actual or constructive."

In Long v. Martin, Tex.Civ.App., 234 S.W. 91, 94, the court quoted with approval from Black on Rescission and Cancellation, as follows: "Where persons deal with each other at arm's length—that is to say where there is no relation of trust or confidence between them, but each is supposed to be on his guard against the other—and no direct inquiries are made and all the sources of information are equally open to both, so that each can, if he will, possess himself of all the knowledge possessed by the other, then there is no duty of disclosure resting on either party, and if one knows circumstances affecting the matter in hand, of which the other is ignorant, it is an advantage of which he may legitimately avail himself so that his mere silence or failure to volunteer information is not fraudulent, either actually or constructively. For the concealment 'which the law denounces as fraudulent implies a purpose or design to hide facts which the other party ought in justice to know, and mere silence is not in itself concealment.'"

In Restatement Torts, Vol. 3, pp. 118–119, the basis of liability in such a case is stated as follows: "The conditions under which liability is imposed for nondisclosure in an action for deceit differ in one particular from those under which a similar non disclosure may confer a right to rescind the transaction or to recover back money paid or the value of other benefits conferred. In the absence of a duty of disclosure, under the rule stated in Subsection (2) of this Section, one who is negotiating a business transaction is not liable in deceit because of his failure to disclose a fact which he knows his adversary would regard as material."

In Salter v. Aviation Salvage Co., 129 Miss. 217, 91 So. 340, 342, 26 A.L.R. 989, it is said: "The party charged with the fraud must have owed the party alleged to have been defrauded some duty. He must have been under some obligation to

speak when he failed to do so. Mere silence alone is not sufficient. * * * Appellant occupied no relation of trust or confidence toward appellees; on the contrary they appear to have been dealing at arm's length."

Also, see Miller v. Anderson, 183 Wis. 163, 196 N.W. 869, 34 A.L.R. 1529; Windrom Mfg. Co. v. Boston Blacking Co., 239 Mass. 123, 131 N.E. 454, 17 A.L.R. 669, 672; Cleveland v. Richardson, 132 U.S. 318, 10 S.Ct. 100, 33 L.Ed. 384; Patten v. Standard Oil Co., 165 Tenn. 438, 55 S.W.2d 759; Randolph v. Allen, 5 Cir., 73 F. 23; Bartlett v. Terrell, Tex.Civ.App., 292 S.W. 273, 280, writ refused; Jones v. Herring, Tex.Civ.App., 16 S.W.2d 325; Bondies v. Glenn, Tex.Civ.App., 119 S.W.2d 1095, 1098.

■ In its pleadings, evidence and brief, plaintiff stresses the fact that the account was verified by defendant. We think the verification is not conclusive on any theory of the case. The account was verified on January 19, 1939. The last item in the account here involved was sold by plaintiff to defendant on January 17, 1939. Mitchell's defalcation was known or suspected by plaintiff at the time of the verification of the account and he was discharged almost simultaneously therewith. There is no evidence that plaintiff made any sales or in any way acted to its hurt relying upon such verification.

We have given careful consideration to the case of Harworth v. Truby, 138 Pa. 222, 20 A. 942, much relied on by plaintiff. We think identical principles of law are not involved in that and the instant case. There Truby, a retail grocer, allowed Chambers, Harworth's agent, to order a ton of coffee from his principal in Truby's name. When it was received Truby allowed Chambers to take the coffee off and sell it. Truby then sent to Harworth money paid him by Chambers and promised that he, Truby, would pay the balance in a short time. There was a clear case of a loan of his credit by Truby to the agent, Chambers. Truby had actual knowledge of Chambers' fraudulent scheme. Collusion and ratification were shown. Such a situation is at least not conclusively shown in the instant case and the trial court found to the contrary.

■ The record does not show conclusively that Luddington had any other duty than to keep the books and records of

the defendant, or that he had any authority to transact any business for the defendant, except as an employee under the direction of defendant's manager, Padgett. Notice to Luddington of Mitchell's default was not notice to defendant. However, we think it is not conclusively shown that Luddington possessed such knowledge.

We think, therefore, liability of the defendant is not shown by evidence tending to show knowledge on the part of Luddington. Re-Statement of Agency, Vol. 1, sec. 272; 3 C.J.S., Agency, §§ 262–265, pp. 194–200; Dimmitt Elev. Co. v. Carter, Tex.Civ.App., 70 S.W.2d 615; J. M. Radford Groc. Co. v. Citizens' Nat. Bank, Tex.Civ.App., 37 S.W.2d 1080; Miller v. Anderson, 183 Wis. 163, 196 N.W. 869, 34 A.L.R. 1529, 1537.

We think that only questions of fact are presented by the record. 12 R.C.L. p. 447; Wintz v. Morrison, 17 Tex. 372, 67 Am. Dec. 658; Briscoe v. Bronaugh, 1 Tex. 326, 46 Am.Dec. 108; 14A C.J. p. 410, 19 C.J.S., Corporations, § 1034. These facts have been determined adversely to plaintiff. The essential facts found are supported by the testimony.

The judgment is affirmed.